UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RCC Ventures, LLC,

        Plaintiff,

–v–

American DG Energy, Inc., *et al.*,

        Defendants.

17 Civ. 3007 (AJN)

MEMORANDUM OPINION
AND ORDER

---

ALISON J. NATHAN, District Judge:

    In this action, Plaintiff RCC Ventures, LLC alleges violations of the Defense of Trade Secrets Act of 2016, as well as state-law claims for breach of contract, quantum meruit, unjust enrichment, and promissory estoppel against American DG Energy, Inc. and EuroSite Power, Inc., collectively the "Defendants." The Defendants move to dismiss RCC's First Amended Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons described below, the motion to dismiss is granted in part and denied in part.

## I. Background

    The following facts come from the First Amended Complaint and are taken as true in deciding the motion to dismiss. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 151 (2d Cir. 2007). Defendant American DG Energy is a corporation engaged in the business of "distributing, owning and operating clean, on-site energy systems that produce electricity, hot water, heat, and cooling in the United States." First Amended Complaint ("FAC"), Dkt. No. 16, ¶ 6. Defendant EuroSite Power is a subsidiary of American DG Energy that delivers American

1

DG Energy's services in the United Kingdom. FAC ¶ 7. As of December 31, 2014, American DG Energy owned 50.1% interest in EuroSite Power, and several of American DG Energy's officers were either officers of EuroSite Power or sat on its Board of Directors. FAC ¶¶ 8, 10-12. Plaintiff RCC is a debt advisory company that provides businesses with "customized debt solutions to reorganize debt and raise capital." FAC ¶ 3.

In June 2015, EuroSite Power experienced net losses of approximately $6.2 million and expected to continue experiencing operating losses in the near future. FAC ¶¶ 22-23; EuroSite Power 10Q (June 30, 2014), Dkt. No. 1-1. As a result, in September 2014, Gabriel Parmese – Chief Financial Officer, Secretary, and Treasurer of both American DG Energy and EuroSite Power, FAC ¶ 12 – engaged in negotiations with Plaintiff RCC about the terms of a debt financing agreement. FAC ¶ 24. On or about September 24, 2014, Parmese executed a debt financing agreement (the "Agreement") with RCC on behalf of American DG Energy as its Chief Financial Officer. FAC ¶ 27. The Agreement identified the "Lender" as being "RCC Ventures, LLC. Or its senior lender, or assignee, or third party as hereinafter described" and the "Borrower" as being "American DG Energy, Inc." Agreement, Dkt. No. 16-3, at 1. Among the provisions of the Agreement was a Non-Circumvention clause stating

> In the event R.C.C has introduced the Borrower to a third party and Borrower then enters into a debt transaction with that third party, or any affiliate of that third party, within 36 months following this acknowledged, agreed, and accepted signed proposal, R.C.C shall be entitled to a cash finder's fee equal to two (2.00%) percent of the aggregate loan made by such third party or affiliate thereof as part of such debt transaction.

FAC ¶ 28; Agreement at 4. The First Amended Complaint alleges that during the negotiation of this Agreement, Parmese "specifically discussed the need of financing for its UK operations with RCC." FAC ¶ 36.

2

On November 20, 2014, under the terms of the Agreement, RCC identified and introduced Macquarie Bank Limited ("Macquarie") to American DG Energy and EuroSite Power as a prospective lender. FAC ¶ 32. According to the First Amended Complaint, American DG Energy sought to provide financing from Macquarie "not only for ADGE's operations in the United States but also for expansion of EUSP's business in the United Kingdom." FAC ¶ 35. On or about December 19, 2014, American DG Energy executed a Non-Disclosure Agreement with Macquarie and began negotiating a potential financial transaction. FAC ¶¶ 39-44, 48-51, 59-63. However, on July 7, 2015, Parmese emailed RCC to say that American DG Energy and EuroSite Power would not need debt financing at that time. FAC ¶ 73.

On or about December 17, 2015, unbeknownst to RCC, EuroSite Power entered into a financing arrangement with Macquarie affiliate Macquarie Equipment Finance (UK) Ltd. FAC ¶¶ 82-83. The financing agreement was fully executed on or about March 30, 2016. FAC ¶ 82.

On April 25, 2017, RCC initiated the present action by filing a complaint alleging breach of contract and quasi-contract claims against the Defendants. *See* Complaint, Dkt. No. 1. On June 21, 2017, the Defendants moved to dismiss the complaint. Dkt. No. 12. On July 10, 2017, the Plaintiff filed its First Amended Complaint, which added a claim for violation of the Defense of Trade Secrets Act of 2016 ("DTSA") and dismissed Defendant American DG Energy from the alleged quasi-contract claims. *See* FAC. On July 24, 2017, the Defendants moved to dismiss the First Amended Complaint. MTD, Dkt. No. 17.

## II. Legal Standard

To survive a Rule 12(b)(6) motion, a plaintiff must allege facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A

claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Allegations that are "conclusory" are "not entitled to be assumed to be true." *Id.* at 681; *see also id.* at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). A complaint cannot survive a motion to dismiss if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* at 679. "In addition to the allegations in the complaint itself, a court may consider documents attached as exhibits, incorporated by reference, or relied upon by the plaintiff in bringing suit, as well as any judicially noticeable matters." *ACE Sec. Corp. Home Equity Loan Tr. v. DB Structured Prods.*, 5 F. Supp. 3d 543, 551 (S.D.N.Y. 2014).

## III. Discussion

The Defendants move to dismiss the First Amended Complaint in its entirety. For the reasons that follow, RCC's trade secret claim and breach of contract claim are dismissed against both Defendants. The motion to dismiss RCC's quasi-contract claims against Defendant EuroSite Power is denied.

### A. RCC's Trade Secret Claim Is Dismissed for Failing to Sufficiently Allege Conduct Occurring After the DTSA's Enactment

The Plaintiff's first claim alleges that the Defendants "have used RCC's confidential and proprietary information in soliciting other prospective lenders, including [an] affiliate of Macquarie to its benefits [sic]" in violation of the DTSA. FAC ¶ 122. Because RCC specifically alleges only conduct occurring prior to the DTSA's enactment on May 11, 2016, the Plaintiff has not stated a claim upon which relief can be granted.

The DTSA authorizes the "owner of a trade secret that is misappropriated" to bring a

civil action seeking an injunction and damages against the misappropriator. 18 U.S.C. § 1836(b)(1)-(3). Prior to 2016, civil actions had to be brought by the Attorney General and were limited to seeking injunctive relief. *See* Economic Espionage Act of 1996, Pub. L. No. 104-294, § 1836, 110 Stat. 3488, 3490. The DTSA amended the law to create a private right of action seeking damages for misappropriations occurring "on or after the date of enactment of th[e] Act." Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, sec. 2, §§ 1833, 1836, 130 Stat. 376, 376-82. The DTSA became effective on May 11, 2016. 130 Stat. 376. Thus, only misappropriations occurring after May 11, 2016 are actionable.

The First Amended Complaint alleges that the Defendants misappropriated RCC's trade secrets "to solicit and ultimately engage in financial transactions with an affiliate of Macquarie." FAC ¶ 123. According to the First Amended Complaint, the financial transaction between EuroSite Power and a Macquarie affiliate (Macquarie Equipment Finance (UK) Ltd.) occurred on or about March 30, 2016. FAC ¶ 82. Because the financial transaction predated the enactment of the DTSA, RCC is unable to state a claim under the DTSA for misappropriation of trade secrets in connection with that deal.

The First Amended Complaint further alleges that "[u]pon information and belief, ADGE and EUSP [are] willfully and improperly using RCC's proprietary information and intend to use RCC's trade secrets for their own financial benefits." FAC ¶ 124. From this, RCC argues in its memorandum opposing the motion to dismiss that "ADGE and EUSP[] used, have been using and will continue to use RCC's trade secrets in their ongoing engagement and negotiations with Macquarie, Macquarie's affiliates, MEF and possibly all other prospective lenders to whom RCC identified and introduced to Defendants." Memo. in Opp. to MTD ("Opp."), Dkt. No. 21, at 11.

However, the Plaintiff provides no basis for its assertion that the Defendants are currently using its proprietary information or why they will be likely to use it in the future. RCC does not even allege facts to support the inference that the Defendants will need to reorganize their debt again in the future or that the allegedly proprietary "business and financial information" the Defendants misappropriated would be of use in procuring a financial transaction in the future. As a result, the Court concludes that RCC's allegations of continued and future violations of the DTSA are "mere conclusory statements" that "do not suffice" to defeat a motion to dismiss. *Iqbal*, 556 U.S. at 678.

Because the only allegations of misappropriation of a trade secret that are pled with particularity predate the enactment of the DTSA, RCC has not stated a claim upon which relief may be granted. As a result, the motion to dismiss is granted as to Count 1.

### B. RCC's Breach of Contract Claim Is Dismissed for Failing to State a Claim as to Either Defendant

RCC next alleges that the Defendants breached the terms of the Agreement, specifically the Agreement's Non-Circumvention clause. FAC ¶¶ 28-29, 128-34; Agreement at 4. "To recover on a breach of contract claim under New York law, a plaintiff must establish: (1) the existence of a valid contract; (2) due performance by the plaintiff; (3) breach by the defendant; and (4) damages to defendant caused by the breach." *DLJ Mortg. Capital Inc. v. Home Loan Corp.*, 667 F. Supp. 2d 368, 368 (S.D.N.Y. 2009). The Court concludes that the claim must be dismissed against both Defendants because the allegations are insufficient to establish that American DG Energy breached the terms of the Agreement. Moreover, EuroSite Power was not a party to the Agreement.

#### 1. American DG Energy Did Not Breach the Agreement

The Non-Circumvention clause of the Agreement states that

> [i]n the event R.C.C has introduced the Borrower to a third party and Borrower then enters into a debt transaction with that third party, or any affiliate of that third party, within 36 months following this acknowledged, agreed, and accepted signed proposal, R.C.C shall be entitled to a cash finder's fee equal to two (2.00%) percent of the aggregate loan made by such third party or affiliate.

FAC ¶ 28; Agreement at 4. Thus, under the plain terms of the Agreement, RCC was entitled to a finder's fee only if the Borrower – American DG Energy – "enter[ed] into a debt transaction" with the third party or its affiliate. FAC ¶ 28; Agreement at 4. In this case, the Plaintiff does not allege that American DG Energy itself ever entered into a debt transaction with Macquarie or its affiliate. Instead, it was EuroSite Power that allegedly entered into a financing arrangement with a Macquarie affiliate. FAC ¶ 82. As a result, American DG Energy did not breach the Agreement by failing to pay RCC a finder's fee based on a contract signed between EuroSite Power and Macquarie Equipment Finance (UK) Ltd.

RCC argues that American DG Energy is liable for EuroSite Power's actions "under agency principles." Opp. at 18. In support of this argument, RCC cites several cases that hold a parent company liable for torts committed by a subsidiary. *See* Opp. at 18 (citing *Weisser v. Mursam Shoe Corp.*, 127 F.2d 344, 347 (2d Cir. 1942); *Mangan v. Terminal Transp. Sys., Inc.*, 284 N.Y.S. 183, 189 (Sup. Ct. 1935); and *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988)). However, under New York law, a "simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). Because no such independent duty exists here, the principles of tort law pointed to by the Plaintiff are inapposite to the facts of this case. As a result, the Court finds no basis upon which to conclude that American DG

Energy ever breached the terms of the Agreement. The breach of contract claim is thus dismissed as to Defendant American DG Energy.

### 2. EuroSite Power Was Not a Party to the Agreement

The Court likewise finds that the First Amended Complaint does not state a breach of contract claim upon which relief can be granted as to Defendant EuroSite Power because EuroSite Power was never a party to the Agreement. The sole Borrower listed on the Agreement is American DG Energy. Agreement at 1. The Agreement was signed by Gabriel Parmese on behalf of only American DG Energy, as evidenced by American DG Energy being the only company listed above Parmese's signature line, Agreement at 6, and the header and footer of the Agreement listing the contract as one pertaining to "American DG Energy, Inc.," *see generally* Agreement. As a result, the plain language of the Agreement only entitled RCC to a finder's fee if American DG Energy entered into a financial transaction.

Plaintiff argues that while the Agreement itself did not bind EuroSite Power, a series of emails that were attached to the First Amended Complaint demonstrated the parties' intent to include EuroSite Power as a Borrower to the Agreement. FAC ¶¶ 43-51, 57-68, 130-31; *see also* Opp. at 19-21. Under New York law, emails "constitute 'signed writings'" because a party's "name at the end of his e-mail signifie[s] his intent to authenticate the contents." *Stevens v. Publicis, S.A.*, 854 N.Y.S.2d 690, 692 (App. Div. 2008). However, courts have found emails to be sufficient to amend the terms of a contract only when the emails in question expressly stated both an intent to modify the contract and the terms that would be modified. *See id.* (holding that the terms of a contract were amended by email where "both sides expressed their unqualified acceptance of the modification to the agreement"); *Naldi v. Grunberg*, 908 N.Y.S.2d 639, 647-48

(App. Div. 2010) (holding that there was no "meeting of the minds" where plaintiff's email counteroffered $52 million but defendant's draft contract offered $50 million). For example, in *Stevens*, one party to the contract sent an email proposing a specific modification to the existing contract:

> Thus I suggested an allocation of your time that would permit the majority of your effort to go against new business development (70%). I also suggested that the remaining time be allocated to maintaining/growing the former Lobsenz Stevens clients (20%) and involvement in management/operations of the unit (10%).

854 N.Y.S.2d at 691. The other party then responded, in part, "I accept your proposal with total enthusiasm and excitement." *Id.* at 692 (emphasis omitted). The initial party responded "I am thrilled with your decision." *Id.* Such discussion was sufficiently specific to the contract to reflect an "unqualified acceptance of the modification to the agreement." *Id.*

The Court concludes that the emails upon which RCC relies do not state expressly – or even clearly imply – that the parties were both interested in amending the terms of the Agreement to include EuroSite Power as a borrower. None of these emails even mentions the Agreement, and there is certainly no express discussion of amending the "Borrower" portion of the Agreement to include EuroSite Power as a co-borrower. Instead, the emails in question do no more than describe a general interest in refinancing EuroSite Power or an interest in the UK energy market. *See* May 12, 2015 email, Dkt. No. 16-10 ("Right now John only wants to talk equity raises for American DG Energy or EuroSite Power (EUSP). . . . Do they have any interest at all in an equity investment in ADGE or EUSP?"); May 20, 2015 email, Dkt. No. 16-11 ("I spoke with John, he is willing to talk about a convertible for 5-10 M to start with, if there is interest. . . . American DG Energy and EuroSite Power can use the 5-10 million and Tecogen (TGEN) can use about the same, 5 or maybe 10."); Dec. 3, 2014 email, Dkt. No. 16-5 ("Also, the

9

pipeline for US seems relatively small – six sites, vs nearly 30 for the UK, not evenly split as you had mentioned before."); Apr. 17, 2015 email, Dkt. No. 16-9 ("One issue driving this, is we have a 24 unit quote going out in the UK and the required capital for this one deal is $6 million and the deal has high margins in the low 40% range."). Such comments fall far short of the unambiguous intent to amend a specific contract provision that was approved in *Stevens*. Instead, these emails suggest several alternative understandings of the parties, including that the parties anticipated that EuroSite Power would be a beneficiary of a financial transaction between American DG Energy and Macquarie, *see* EuroSite Power 10Q (June 30, 2014) (suggesting that EuroSite Power could raise additional capital by using money provided by American DG Energy), or that the parties were in the early stages of negotiating an additional deal between RCC and EuroSite Power. Given the "more likely explanations" of these emails, RCC has not plausibly alleged that they amended the Agreement to list EuroSite Power as a co-Borrower. *See Iqbal*, 556 U.S. at 681 ("Taken as true, these allegations are consistent with petitioners' purposefully designating detainees 'of high interest' because of their race, religion, or national origin. But given more likely explanations, they do not plausibly establish this purpose.").

Because EuroSite Power is not, and has never been, a Borrower under the Agreement, it did not breach that contract by failing to pay RCC a finder's fee after it entered into a financial transaction with an affiliate of Macquarie. As a result, the motion to dismiss is granted on RCC's breach of contract claim as to Defendant EuroSite Power.

### C. RCC's Quasi-Contract Claims Against EuroSite Power Are Not Dismissed Because No Contract Covers the "Subject Matter" of the Claims

RCC next alleges that it is entitled to relief against EuroSite Power based on the quasi-contract claims of quantum meruit, unjust enrichment, and promissory estoppel. FAC ¶¶ 136-54.

Defendant EuroSite Power moves to dismiss these claims because "[t]here can be no quasi-contract claim against a third-party non-signatory to a contract that covers the subject matter of the claim." Reply Memo., Dkt. No. 24, at 9 (quoting *Randall's Island Aquatic Leisure, LLC v. City of N.Y.*, 938 N.Y.S.2d 62, 63 (App. Div. 2012)); *see also* Memo. in Support of MTD ("Support"), Dkt. No. 17-1, at 15-16. However, the Court has already concluded above that there is no contract that covers the subject matter of this claim – namely, whether RCC is entitled to a finder's fee from a financial transaction EuroSite Power signed with Macquarie or its affiliate, which was a financer to whom RCC introduced EuroSite Power's management. Courts have defined the "subject matter" of a claim with specificity when deciding if it is governed by a valid contract. *See, e.g., Scarola Ellis LLP v. Padeh*, 984 N.Y.S.2d 56, 60 (App. Div. 2014) (defining the "subject matter" of the claim as "the legal fees to which [the plaintiff] is entitled with respect to services provided in the action against Corcoran" in which the plaintiff represented the defendant); *Melcher v. Apollo Med. Fund Mgmt. L.L.C.*, 959 N.Y.S.2d 133, 142 (App. Div. 2013) (defining the "subject matter" of the claim as the proper share of net profits to which the plaintiff was entitled in the co-management of an investment firm). Because the Agreement does not concern EuroSite Power, it cannot cover the subject matter of these quasi-contract claims.

EuroSite Power argues that the Agreement should be treated as covering the subject-matter of these claims "because RCC has alleged it" and identified the Agreement as "'the agreement from which this dispute arises." Support at 16 (quoting FAC ¶¶ 17-18). EuroSite Power cites no authority for the proposition that the Court should conclude that a valid contract covers the subject matter of these quasi-contract claims – even though the Court has already

11

concluded that the Agreement does not concern EuroSite Power's actions – merely because the Plaintiff alleged that the Agreement reached EuroSite Power. Furthermore, EuroSite Power's argument is inconsistent with myriad opinions holding that contract and quasi-contract claims may be alleged in the alternative, "particularly where there is uncertainty as to whether an enforceable contract that governs the issue exists." *Reis, Inc. v. Spring11 LLC*, No. 15-cv-2836 (PGG), 2016 WL 5390896, at *14 (S.D.N.Y. Sept. 26, 2016) (citing *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 663 (2d Cir. 1996)).

As a result, the Court concludes that RCC is entitled to pursue its quasi-contract claims against Defendant EuroSite Power. The motion to dismiss is denied as to Counts 3, 4, and 5 of the First Amended Complaint.

## IV. Conclusion

The motion to dismiss is granted as to Claims 1 and 2. The motion to dismiss is denied as to Claims 3, 4, and 5. Because Claims 3, 4, and 5 are brought only against Defendant EuroSite Power Inc., American DG Energy, Inc. is dismissed from this action. This resolves docket number 17. An initial pretrial conference in this matter will be scheduled under separate order.

SO ORDERED.

Dated: March __, 2018
New York, New York

_____
ALISON J. NATHAN
United States District Judge